UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 15-10317-DJC |
| | ) | |
| KENNETH DENNY | ) | |

DEFENDANT'S SENTENCING MEMORANDUM

Defendant Kenneth Denny respectfully submits this memorandum in aid of sentencing.

I.      PROCEDURAL HISTORY

On July 24, 2015, Denny was arrested by the Boston Police on a charge of bank robbery and was held in state custody until September 17, 2015, at which time he made his initial appearance in this court.  He has remained in custody throughout.

The offense conduct was that on July 24, 2015, he entered the Citizens Bank on Washington Street in Brighton, Massachusetts, approached a teller, and handed her a note. He removed what appeared to be a bomb from a newspaper he was carrying, and placed it on the teller's counter. The device, as it turned out, was made out of broomsticks and spray paint.  He demanded money, while simultaneously placing his own wallet on the counter (with his ID inside), leaving it behind as he exited the bank.  On the way out, he was confronted by the bank manager whereupon he dropped the money and ran, fleeing around the corner where he discarded some clothes in the bushes.  He then doubled back towards the bank and was apprehended essentially right outside the bank.

On April 20, 2016, Mr. Denny pleaded guilty in this Court to the one-count indictment charging bank robbery in violation of 18 U.S.C. § 2113(a) and (d).

1

While awaiting sentencing in this Court, Mr. Denny was transported to the U.S. District Court in the Western District of New York, to appear in that District in connection with an indictment in United States v. Denny, 16-167-G.  The indictment charged similar conduct, namely a note bank robbery with a fake bomb occurring on April 30, 2015 at the Bank of America branch located in Tonawanda, New York.   On June 1, 2017, Denny pleaded guilty to a single count, as here, under 18 U.S.C. §§ 2113(a) and (d), and was immediately sentenced, pursuant to a written plea agreement entered into under Fed.R.Crim.P. 11(c)(1)(C), to a term of 51 months.

He is scheduled for sentencing in this Court on June 8, 2017.

II.     THE APPLICABLE GUIDELINE

Under the terms of the plea agreement, the parties agree that, in accordance with USSG § 2B3.1, Mr. Denny's base offense level is 20; in accordance with USSG § 2B3.1(b)(1), Mr. Denny's offense level is increased by 2 because the property of a financial institution was taken; and, in accordance with USSG § 2B3.1(b)(2)(D), Mr. Denny's offense level is increased by 4 because he used a dangerous weapon (a fake bomb).  Reduced for acceptance of responsibility, the total offense level is 23.

These guidelines replicate the guidelines in the Western District proceeding. As in this Court, the guidelines were found to be, by agreement and in the Court's ruling, a base offense level of 20, a two-level specific offense characteristic increase because the property taken was from a financial institution, and a four-level increase because a dangerous weapon was otherwise used in the offense, resulting in a total adjusted offense level of 26. With a total decrease of three levels for acceptance of responsibility, the resulting total offense level was 23. Mr. Denny has been found to be in criminal history category II, with the instant offense accounted for in the

2

calculation.  The resulting sentencing range was 51 to 63 months.  Denny was sentenced at the low end under a "C" plea that brooked no downward departure.

It is worth noting that the Criminal Complaint in the Western District of New York was filed on February 3, 2016.  Denny was not brought to that court for an initial appearance on that complaint; in the interim, he pleaded guilty plea in this District on April 20, 2016.  Only thereafter was he indicted in the Western District (on December 14, 2016) and thereafter arraigned (on February 1, 2017).  As a result of the Western District's delay in formalizing its proceedings, the charge there, and its possible resolution, were not the subject of the plea negotiations in this District, affording latitude in that district for the government to drive a guideline sentence, without leave for defendant to seek a lower disposition.  The Court here is not similarly constrained, although with the Western District sentence already imposed, the Court cannot do more, if it is inclined, than ensure that no greater effective sentence is imposed in this District, factoring in that even an identical concurrent sentence would add a small increment of consecutive time to the sentence which prosecutors in the Western District exacted.

III.    <u>PERSONAL HISTORY</u>

Mr. Denny, now 61, is one of three children born to his father, Earl C. Denny and his mother, June Denny.  His early years, as he puts it, were idyllic, and his life thereafter, up to approximately age 58, was one of hard work and accomplishment.  He graduated with a B.S. degree from Wentworth Institute of Technology in 1988 and a Master of Science degree in Urban Affairs from Boston University in 1996.  Mr. Denny had a successful career as an architectural engineer.  He was employed over the years in business development and also worked as an independent consultant in that same area. By all independent measures, he was a successful, contributing member of society.

His collapse, evident from his first criminal conviction occurring at age 58 (an OUI in 2013), begs the obvious question: why?  Up to age 58, he was a successful and gainfully employed professional working, inter alia, as an architectural designer for BU and for Parsons Brinkerhoff, making significant money. Perhaps his difficulties started with neurological issues first apparent in 2006.

In April 2006, his medical records show complaints of double vision, although his eye exam was normal, followed by an MRI where there was a finding of some small vessel disease, but no evidence of strokes or aneurysms.  From the tests administered and the expressed concern about strokes, one might fairly assume he was experiencing some cognitive abnormalities.  In 2008, he sought medical treatment at Tufts Medical Center following being assaulted and losing consciousness for a few minutes.  He had awakened confused, disoriented, and dizzy with a headache and blurry vision.  He left the medical center against medical advice in the early morning hours, adamant about leaving saying he had to testify in the morning about a rape case and that his life was on the line.  The puzzling episodes persisted.  In 2011, he reported multiple episodes of what he calls a "mental disconnect" during which he "cannot decipher absolute consciousness."  In April 2012, he was at Tufts Medical Center for an MRI indicating Focal Onset Complex Partial Epilepsy, with complaints of episodes of altered mental status and results suggesting mild temporal cerebral dysfunction.  Throughout, he maintained his employment, up until March 27, 2013 when he was terminated for not meeting job expectations, then as the full-time Director of Business Development with Congress Construction Company in Peabody, Massachusetts, at the time earning over $100,000.   Later that year, on December 3, 2013, troopers were called to the scene of a motor vehicle accident where he was charged with operating under the influence of alcohol.  At about the same time, he had entered a relationship

with a cocaine user and had become addicted.  He lost his driver's license and without

employment ended up losing everything to buy drugs, to the point where he was homeless by the

summer of 2015.  At the time of the crime, he was intermittently sleeping on a park bench and

staying with a friend in Brighton. Cocaine had grabbed a hold of him; he depleted his bank

account and robbed the banks because he needed money.

At bottom, it is difficult, with precision, to account for the issues which bedeviled Mr.

Denny.  Certainly, there is some evidence of a brain abnormality, and he continues to suffer from

seizures and memory loss consistent with seizure disorder. But, whatever the cause, there was

plainly a collapse, a pitiful decline of a human being into addiction, penury, and ultimately

prison.

IV.     MR. DENNY IS REMORSEFUL AND HAS THE SUPPORT FROM FAMILY AND
        COMMUNITY

Mr. Denny acknowledges how catastrophic his cocaine addiction has been to his life and

he exhibits genuine remorse for his conduct. As was noted in the Western District proceedings, it

hurts him to think that he was "that person" who put fear in the bank employees by his conduct

and would like to reconcile with the victims and bank in whatever way possible. (Western

District PSR, ¶ 19).

While his parents are deceased, he has the support of his sisters, Pamela Knight and

Sharon Derrick, both of whom reside in western New York. Mr. Denny has good relationships

with his sisters. He plans to live with his sister, Pamela, when he is released from custody.

(Western District PSR, ¶¶ 61, 63). She describes Mr. Denny as "supportive, loving and family

oriented," and confirms that Mr. Denny suffered a downward spiral, including his lost jobs,

relationships and drug addiction which lead to the instant offense conduct. (PSR, ¶ 63). She

remains supportive of him and with this continued family support, Mr. Denny can be successful
when released.

V.       THE GUIDELINES: NATIONAL TRENDS

Nationally, the rate of within-guideline sentences has fallen below 50%, from 52% in
FY2012, to 51% in FY2013, to 46% in FY2014, 47.3% in FY2015, and 48.6% in FY2016.   In
this District, the rate too has been falling, from 43% in FY2012, to 39% in 2013, to 23% in
FY2014, with slight upticks to 25% in FY2015 and 27.5% in FY2016.  In this District as well,
the government has assisted this decline, sponsoring reductions by 16% in 2012, increased to
21% in 2013, to 29% in 2014.

Nationally, according to Sentencing Commission statistics for FY2016, 52.1% of robbery
cases nationally were sentenced within the guideline range. See USSC, Sourcebook, Table 27A,
"Sentences Relative To The Guideline Range By Each Primary Offense Category."  When courts
departed downward, the median decrease from the guideline minimum was 15 months and the
median percentage decrease was 21.3%.  See Table 31A, "Downward Departures From
Guideline Range: Degree Of Decrease For Offenders In Each Primary Offense Category,
FY2016."

VI.      THE APPROPRIATE SENTENCE

Defendant seeks a committed term concurrent with his federal sentence of 51 months
imposed in the Western District of New York.  However, in implementing the sentence,
defendant notes that, should the Court impose the identical sentence of 51 months concurrent, the
sentence would only begin to run on the date of the sentencing, and thus would  result in an
additional period of days in custody (from June 1, 2017 to June 8, 2017).  More concerning is the
issue of credit for time served.  Defendant has served an unbroken term of 1 year, 10 months and

17 days in custody (assuming sentencing on June 8, 2017).  Undersigned telephoned the BOP's

Computation Center and was first told that the jail credit would be applied to the first sentenced

federal case (so Western District's 51 month), and not the second.  This appears consistent with

the note in the Western District's presentence report:

> Time in Custody: 1year, 10 months, and 9 days (According to a representative from the
> Bureau of Prison's Designation and Sentence Computation Center, although the
> defendant was initially arrested in the District of Massachusetts under Docket No.
> 1:15CRI0317, since he will be sentenced under Docket No. I :16CR00167 in the Western
> District of New York first, the time he has spent in custody to date will be applied to the
> sentence imposed in the Western District of New York.)   Presentence Report, Western
> District of New York, at 3.

The BOP representative then corrected himself, after consulting with others who were not on the

phone call, and said that the sentence, if concurrent, would first be aggregated and only then

would the credit be applied.  This advice appears consistent with the statute, which provides that

"[m]ultiple terms of imprisonment ordered to run consecutively or concurrently shall be treated

for administrative purposes as a single, aggregate term of imprisonment."  18 U.S.C. § 3584(c).

One would fairly surmise from the statute that credit would be deducted only after aggregation,

but there seemingly is no directive to that effect.  Consequently, defendant suggests that it would

be prudent to impose a sentence here which would obviate the risk of the outcome described in

the New York presentence report, accordingly a sentence which subtracts both the time lapse

between the two sentencings (8 days) as well as the jail credit of almost two years.  Consequently

defendant asks that the Court impose a sentence of 51 months, less 8 days, less 1 year, ten

months and 17 days, and less the likely good time to be subtracted as a consequence of the good

time, thus 24 months concurrent.  Such a sentence – 24 months concurrent -- would reflect a

disposition concurrent with the Western District case, but would avoid the risk of any additional

time being served.

Under all the circumstances, then, Mr. Denny respectfully requests that this Court sentence him to 24 months, concurrent with the term in United States v. Denny, 16-167-G. Recognizing that his addiction will be a lifelong battle for him, Mr. Denny requests that this Court recommend that he participate in the Residential Drug Treatment Program while he is incarcerated with the Bureau of Prisons.

Defendant submits that such a sentence is sufficient but not greater than necessary to assure adequate punishment in this case.

KENNETH DENNY
By his attorney,

*/s/ Charles P. McGinty*
Charles P. McGinty
  B.B.O. #333480
Federal Defender Office
51 Sleeper Street, 5th Floor
Boston, MA  02210
Tel: 617-223-8061

### CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on June 6, 2017.

*/s/ Charles P. McGinty*